Martino **HRONCICH**, Libellant-Appellant,

v.

**AMERICAN PRESIDENT LINES, LTD.,**
Respondent-Appellee,

and

**Seaboard Contracting Co., Inc.**

**No. 14622.**

United States Court of Appeals
Third Circuit.

Argued Feb. 6, 1964.

Decided July 24, 1964.

Samuel L. Marciano, Hoboken, N. J. (Florio, Dunn, Marciano & Lypinski, Hoboken, N. J., Lawrence E. Florio, Hoboken, N. J., of counsel, on the brief), for appellant.

James L. R. Lafferty, Newark, N. J. (Steelman, Lafferty, Rowe & McMahon, Newark, N. J., on the brief), for respondent-appellee.

Before McLAUGHLIN, GANEY and SMITH, Circuit Judges.

GANEY, Circuit Judge.

Prior to its arrival at the port of Hoboken, New Jersey, the lower No. 1 tween deck of the S. S. President Tyler had been filled to the top in tiers of crude rubber bales, roughly in the shape of cubes. Most of the bales were approximately eighteen inches high and weighed between 210 and 250 pounds. At the deepest level, they were stacked approximately twenty to twenty-five tiers deep. There was no solid material separating the bales from one another even though they had a tendency to stick together when pressure was applied to them in relatively warm temperatures.

On August 26, 1958, the President Tyler was berthed at a pier in Hoboken. The respondent-appellee, owner of the vessel, engaged Seaboard Contracting Co., Inc., to unload the vessel. Libellant-appellant, an employee of Seaboard Contracting Co., Inc., was a member of one of the teams of four men assigned to unload the rubber bales. After a sufficient number of bales were removed from a location under the square of the hatch, the men would stand in the vacant area where the removed bales had been. Half of the team, with the aid of grappling hooks, would dislodge one of the uppermost cubes, pull it from the tier and then let it fall to the level where the other men were standing. Sometimes the bales would stick together and more than one bale would come down when the longshoremen pulled at one of them. The bales which had adhered together, except on occasions, would separate when they struck the lower surface. The other half of the team, of which libellant was a member, standing in the vacant area, would then roll the bales onto a net. When between twelve and fourteen bales had been rolled on the net, it was hoisted aloft by lifting gear.

At a time when the unloading had gotten close to the bottom of the tween deck and the lowest level of the vacant area was about five to six tiers deep, the longshoremen attempted to dislodge one of the top bales on the outer edge of the vacant area. Instead of a single bale falling down, a vertical column composed of three to four bales adhering together toppled over. When the column struck

the bottom level of the open area, one of the bales separated from the others, bounced around, struck libellant and injured his leg.

Three years and three days later, he brought a suit in admiralty against the owner of the vessel in the United States District Court for the District of New Jersey. The vessel owner impleaded the stevedoring concern. At the close of libellant's case, the court granted respondent's motion to dismiss the libel.[1] In its oral decision granting the motion, the court, in part, stated:

"The evidence before the Court at the case at bar seems without contradiction to the following effect: that as long as these chunks or pieces of rubber remained in their stowed position, there was no unseaworthiness as far as the libellant was concerned. They were not dislodged from their position by any defect in the construction or equipment of the vessel. Their stowage in piles was neither impaired nor enhanced as far as efficiency and hazard might have been concerned by presence or absence of dunnage.

"It seems clear and uncontradicted from the evidence that the sole proximate cause of the injuries here complained of was the act or acts of two of the libellant's fellow employees in pulling a group of three or four units or pieces of rubber, which adhered together, from their location at an elevation above where the libellant was standing for the purpose of receiving them for their placement in the cargo net and throwing them or casting them or causing them to fall upon the so-called standing position of the libellant, as a resut of which the impact of the adhering units caused one to separate from the others and to bounce and strike the leg or ankle of. libellant.

"The procedure, according to the testimony of the fellow workman who testified, which was followed in this unloading operation, was no different from that which had been employed on other occasions, both on the same day and on previous days. While there was testimony that in other vessels carrying similar cargo a course or courses of dunnage had been laid which tended to separate groups of three or four courses of rubber units, there is no basis for inference that I can see that the use of similar dunnage in a specific instance similarly located and with a. similar purpose would have prevented the result of the acts of libellant's fellow employees which constituted. the sole cause of his injury.

"Accordingly, I shall find in this case, and I am assuming that there was no dunnage whatsoever and that. these cubes or chunks of rubber did. adhere, no evidence justifying a conclusion that there was any causal. negligence on the part of the shipowner or chargeable to the shipowner insofar as the injuries of the libellant are concerned, nor can I find that the vessel was unseaworthy at the time the particular operation which resulted immediately in the injury to the libellant was commenced."[2]

1. The district court refused to dismiss the libel on the ground of laches.

2. The court also made "Findings of Fact and Conclusions of Law". Findings Nos. 6 and 8 respectively read as follows:
"6. That as long as the blocks of rubber remained in lower No. 1 hold in their stowed position they did not constitute an unseaworthy condition."
"8. The stowage of said blocks of rubber in tiers is neither impaired nor en-hanced as far as efficiency or hazard in unloading may have been concerned by the presence or absence of dunnage."
Conclusions of Law Nos. 1 and 2 state:
"1. The sole proximate cause of libellant's injury was the act of his fellow employees. * * *"
"2. There was no causal negligence on the part of the shipowner or chargeable to it insofar as libellant's injury is concerned, nor was the vessel unseaworthy at the time of the injury to libellant."

From a decree dismissing the libel and the impleading petition, the libellant has appealed.

In Gutierrez v. Waterman S. S. Corp., 373 U.S. 206, 213, 83 S.Ct. 1185, 1190, 10 L.Ed.2d 297 (1963), the Supreme Court said: " * * * Seaworthiness is not limited, of course, to fitness for travel on the high seas; it includes fitness for loading and unloading. Seas Shipping Co. v. Sieracki, 328 U.S. 85 [66 S.Ct. 872, 90 L.Ed. 1099]. It has already been held that when cargo is stowed unsafely in the hold a longshoreman injured thereby may recover for unseaworthiness. E. g., Rich v. Ellerman & Bucknall S. S. Co., 278 F.2d 704, 706 (C.A.2d Cir.); Curtis v. A. Garcia y Cia., 241 F.2d 30, 33–34 (C. A.3d Cir.); Palazzolo v. Pan-Atlantic S. S. Corp., 211 F.2d 277, 279 (C.A.2d Cir.), aff'd on other grounds, 350 U.S. 124, 134 [76 S.Ct. 232, 237, 100 L.Ed. 133]; see Morales v. City of Galveston, 370 U.S. 165, 170 [82 S.Ct. 1226, 1229, 8 L.Ed.2d 412] (dictum). And in at least one case it has been held that a longshoreman could recover for injuries caused by a 'latent defect' in a cargo crate which broke when the longshoremen stood on it. Reddick v. McAllister Lighterage Line, 258 F.2d 297, 299 (C.A.2d Cir.)." And in Ferrante v. Swedish American Lines, etc., et al., 331 F.2d 571 (C.A. 3, 1964), this court, speaking through Judge Kalodner, said at page 575: "When a ship knows, or should have known, that the stevedore's method of discharging its cargo does not conform to the standard of reasonable care, and thereby creates a hazardous condition, the ship is negligent when it does not forbid the use of the method." In that case the court took great pains to point out how the district court erred in failing to apply these principles of law.

■ Whether we view the testimony as on a motion to dismiss or treat the suit as though the district court, sitting without a jury, made findings of fact, it must be accepted as true that a number of rubber bales stuck together; that the operators of the vessel were well aware that this might occur; that the longshoremen used grappling hooks to dislodge the bales and that the bale prior to striking the libellant, had become temporarily affixed to other bales. Under those circumstances the vessel may be considered as having been unseaworthy either because of the manner of its stowage [3] or the method in which its cargo was unloaded.[4] Those in charge of operating the vessel knew or should have known the procedure and method that would be followed in unloading the cargo of rubber, and the sticking together of the bales could have been prevented without much difficulty or expense. Yet the district court concluded that as long as the cargo remained stowed there was no unseaworthiness, and that if material had been placed between the tiers of bales it would not have decreased the risk of harm to which the longshoremen were exposed. We think the district court erred in omitting to apply the correct principles of the maritime law.

■■ In determining whether stowage is seaworthy or not, the fact-finder is not precluded from taking into consideration the method by which the cargo will be unloaded. See Beard v. Ellerman Lines, Ltd., 289 F.2d 201 (C.A. 3, 1961), rev'd on other grounds sub nom. Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 82 S.Ct. 780 (1962). It is usually during the unloading process that the spark is provided which ignites the explosive content created by the potential risk of harm from unseaworthy stowage. This is especially

3. Strachan Shipping Co. v. Alexander, 311 F.2d 385 (C.A.5, 1962); Simpson v. Royal Rotterdam Lloyd, 225 F.Supp. 947 (D.C.S.D.N.Y., 1964).

4. Beard v. Ellerman Lines, Ltd., 289 F.2d 201 (C.A.3, 1961), rev'd on other grounds sub nom. Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962). See also Knox v. United States Lines Company, 294 F.2d 354 (C.A.3, 1961), and Bordas & Co. v. Pizarro Serrano, 314 F.2d 291 (C.A.1, 1963).

true here because of the fact that, as we have indicated, many of the bales, by reason of the manner of stowage, stuck together and were difficult to dislodge in unloading. That the same method of unloading the rubber bales had been performed without mishap in the past is not controlling in determining whether that way is safe.

 Even if the rubber bales were considered as being stowed in a seaworthy state, but the method of discharging it was improper under the conditions of stowage, nevertheless those in charge of operating the vessel could be found to be negligent in permitting the unloading of the bales in this manner.

Accordingly, the Decree of the District Court dismissing the libel and the impleading petition will be vacated and the cause remanded for further proceedings not inconsistent with this opinion.