**Gene A. RUTHERFORD, Jr., Plaintiff,**

v.

**LAKE MICHIGAN CONTRACTORS, INC., Defendant.**

**No. 1:98CV769.**

United States District Court,
W.D. Michigan,
Southern Division.

Feb. 14, 2000.

Order on Reconsideration in Part
May 9, 2000.

that on August 20, 1997, while he was employed as a deckhand aboard the tug *Shirley Joy,* a vessel owned and operated by defendant Lake Michigan Contractors, Inc. ("LMC"), he sustained injuries when he slipped while attempting to face the tug to a barge.

Rutherford has asserted claims against LMC based on negligence under the Jones Act, 46 U.S.C.App. § 688 *et seq.,* and unseaworthiness of the vessel under general admiralty and maritime law. The matter is currently before the court on a motion filed by LMC for summary judgment. Plaintiff Rutherford has opposed the motion. For the reasons to follow, the court grants the motion in part and denies it in part.

## FACTS

LMC is a dredging company with headquarters in Holland, Michigan. As part of its business, LMC owns and operates various vessels used in its dredging operations. On August 20, 1997, Gene Rutherford was working for LMC as a deckhand aboard one of its vessels, the M/V *Shirley Joy,* a tugboat which LMC was using in a dredging project on the Genesee River in or near Rochester, New York. On that day, Rutherford alleges, he injured his back while assisting in the process of facing the *Shirley Joy* to one of LMC's barges which was being used in a dredging operation.

Judith A. Schornack-Smith, Leonard C Jaques, PC, Detroit, MI, for plaintiff.

John A. O'Donnell, Belgrade & O'Donnell, PC, Chicago, IL, Joseph Sukup, Sukup & Grimm, PC, Grand Rapids, MI, for defendant.

## OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MILES, Senior District Judge.

In his complaint filed in this action, plaintiff Gene A. Rutherford Jr. alleges

Three vessels are used during the dredging process: a dredge, a barge, and a tugboat. The Genesee River project involved LMC's dredger, the *Ojibway.* The *Ojibway* is equipped with a large crane, which is used for the purpose of loading a barge with debris removed from the riverbed during dredging. Once a barge is fully loaded with debris, a tugboat is used to push and/or pull the loaded barge to a dumping area (in this instance, Lake Ontario), where the debris is disposed. After dumping its load, the tug then returns with the empty barge to the dredging

area, where the process is repeated. Specifically, the tug is used to maneuver the empty barge into position next to a loaded barge; the tug then detaches from the empty barge, which is held in place by the dredge's crane; and the tug lines are then "faced" to the loaded barge for purposes of transporting it to the dumping area. After the tug departs with its loaded barge, the dredge pulls the empty barge next to it, attaches, and resumes the loading process.

The barge is attached to the dredge with three cables, or lines, and to the tug by two lines. At the end of each cable is a hoop made of hemp, which is put over the cleats on the barge to "marry" the vessels. The hoop section alone weighs approximately 120 to 150 pounds. The responsibility of connecting and disconnecting the tug to the barge lies with the tug's deckhands. As part of the process of "facing" the barge to the tug, one of the tug's deckhands must remove the cable from the outside deck of the tug, passing it approximately six to 10 feet below to another deckhand, who attaches the cable to the barge. Rutherford alleges that he was injured while handing the bow hemp loop of the cable line to co-worker Mark Clapsadle, another *Shirley Joy* deckhand who was assisting on the barge. According to Rutherford, it was during this handing-down process that he experienced "a sharp pain" in his back.

After experiencing this "sharp pain," Rutherford climbed down from the tug to the barge in order to assist the dredging crew in "unfacing" the dredge line from the loaded barge. While attempting to lift the cable at the stern end of the barge, Rutherford further alleges, he felt "excruciating pain" and "blacked out." He was removed from the barge by the Coast Guard and taken to an ambulance ashore.

*ANALYSIS*

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In evaluating a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the burden of establishing the non-existence of any genuine issue of material fact and may satisfy this burden by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). While inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only factual disputes which may have an effect on the outcome of a lawsuit under the applicable substantive law are "material." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

*JONES ACT AND UNSEAWORTHINESS CLAIMS*

Plaintiff Rutherford claims that LMC "was negligent in ordering [him] to single handedly lift 120 lbs. of cable from the bow of the tug." Plaintiff's Response at 6. Rutherford also claims that LMC's vessel was unseaworthy "because it lacked sufficient personnel and contained defective and unsafe equipment." *Id.* at 9. Specifically, Rutherford claims that the cable, or line aboard the *Shirley Joy*, which was composed of steel, rendered the vessel unseaworthy because the steel line was heavier than another type of synthetic line

(known as "Kevlar" line) which had also been used aboard LMC's vessels. In its motion, LMC argues that because Rutherford's claims of negligence and unseaworthiness are based merely on his being required to handle heavy cables, LMC is entitled to judgment as a matter of law on these claims.

■ "The Jones Act provides a cause of action in negligence for 'any seaman' injured 'in the course of his employment.'" *Chandris, Inc. v. Latsis,* 515 U.S. 347, 354, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995) (quoting 46 U.S.C.App. § 688(a)). "A seaman is entitled to recovery under the Jones Act, therefore, if his employer's negligence is the cause, in whole or in part, of his injury." *Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331, 335 (5th Cir.1997). "The elements of a Jones Act negligence claim are: duty, breach, notice, and causation." *Ribitzki v. Canmar Reading & Bates, Ltd. Partnership,* 111 F.3d 658, 662 (9th Cir.1997). *See also Brantley v. Hollywood Casino–Aurora, Inc.,* No. 96C2082, 1998 WL 513089, at *2 (N.D.Ill. Aug. 14, 1998) ("A claim under the Jones Act requires a finding of negligent breach of duty and causation").

■ "Negligence may arise from a dangerous condition on or about the ship, failure to use reasonable care to provide a seaman with a safe place to work, failure to inspect the vessel for hazards or a variety of other breaches of the shipowner's duty of care." *Id.,* 1998 WL 513089, at *3 (citation omitted). As noted above, Rutherford claims that LMC "was negligent in ordering [him] to single handedly lift 120 lbs. of cable from the bow of the tug." In other words, LMC's negligence is allegedly its failure to use lighter, synthetic cable and/or to provide Rutherford with assistance in handling the cable.

■ Negligence is "conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm." *Hernandez v. Trawler Miss Vertie Mae, Inc.,* 187 F.3d 432, 437 (4th Cir.1999) (citations omitted). However, Rutherford must not only establish LMC's negligence, but also that his back injury was within the range of foreseeable risk from LMC's negligent conduct. *Id.* at 438. Why did the steel cable pose an unreasonable risk of harm, according to Rutherford? Because it was heavy.[1]

In *Chisholm v. Sabine Towing & Transp. Co., Inc.,* 679 F.2d 60 (5th Cir. 1982), the plaintiff seaman alleged that he injured his back while lifting a 40 to 50 pound piece of scrap iron in order to throw it overboard. (The scrap iron had been left in the ship's engine room after repairs. The plaintiff and three co-workers had volunteered to perform overtime work jettisoning the metal.) The district court, which entered judgment in the plaintiff's favor, concluded that the negligence of the defendant vessel owner and the unseaworthiness of the vessel were proximate causes of the plaintiff's injuries. However, a divided panel reversed the decision, concluding that although the failure to secure the scrap iron constituted negligence and made the vessel unseaworthy, the plaintiff had failed to show that the defendant's actions were the cause of his injury. Noting that the debris would have to have been jettisoned in any event, the court stressed that the plaintiff had not been injured by the unsecured debris, but rather by disposing of it. *Id.* at 63. The majority decision also noted that the district court had expressly found that the defendant had not been negligent in permitting the plaintiff to undertake the job and that an adequate number of crewmen had been provided to accomplish the task. *Id.* at 61.

---

1.  Plaintiff has also argued that the steel cables were more dangerous than synthetic because the steel can cause serious injury if it "snaps" or breaks during maneuvering. However, the testimony clearly showed that both types of cable can cause injury if they fail. And, more importantly, it is undisputed that Rutherford's injury was not caused by a snapped cable.

Here, Rutherford does not dispute that he was performing a necessary task, and he has not contended that the cables themselves were defective or otherwise not fit for the purpose of facing up the *Shirley Joy* to a barge. He claims merely that lighter cables or the assistance of another crewmember could have been provided by LMC. However, Rutherford has simply presented no evidence that the lighter, synthetic cables would have made his back injury less likely to occur. Moreover, although Rutherford argues that he was "ordered" to perform a strenuous task "single handedly," the evidence presented does not substantiate this contention. Instead, the evidence shows that a third deckhand was present on board the *Shirley Joy* who could, if needed, be enlisted to help Rutherford and/or Clapsadle. *See Lindemann v. Empress Casino Hammond Corp.*, No. 97C8938, 1999 WL 59839, at *4 (N.D.Ill. Jan. 27, 1999) (defendant's motion for partial summary judgment granted, where cocktail server aboard casino boat alleged that defendant's negligence in requiring her to carry heavy loads of glasses caused her back injury; evidence showed that servers had discretion to determine how many glasses they could safely carry). Rutherford has not shown that he asked for help in order to handle the steel cable, nor has he shown that his task was not one which could have been safely performed without the presence of additional crewmembers.

Rutherford stresses that LMC's crew list for the *Shirley Joy* lists four deckhands, when in reality only three were aboard the vessel at the time of his injury. However, as noted above, although the evidence shows that although a third deckhand was aboard the *Shirley Joy* who could have been summoned to help if necessary, the evidence fails to show a request for the third deckhand's assistance. Under the circumstances, Rutherford has failed to establish that the absence of a fourth deckhand played any role in his injury.

This case is not unlike *Lyons v. Ohio River Sand and Gravel Co.*, 683 F.2d 99 (4th Cir.1982). In that case, the plaintiff claimed that he had revived a prior back injury while attempting to lift several heavy "shaker plates" in order to obtain a piece of equipment beneath, a "shaker screen." The plaintiff's theory of liability was first, that the ship maintained an insufficient crew to perform the task on the day in question; second, that the captain was negligent in sending only one man to obtain a screen; and third, that the improper storage of the shaker screens rendered the ship unseaworthy. *Id.* at 100. The district court had granted the defendants' motion for a directed verdict on the issues of negligence and unseaworthiness. Affirming the directed verdict on the negligence issues, the appellate court observed as follows:

> The claim that the JOE LUCAS maintained an inadequate crew on April 29, 1978, is without merit. The evidence was uncontradicted that a full crew consisted of six men and that on that day there were six men on board. The evidence was also uncontradicted that, while it took up to three or four men to lift a shaker plate, one man could easily carry a shaker screen. Lyons testified that he was not ordered to try and lift the plate himself and conceded that he failed to seek any assistance when he encountered the heavy plate. Finally, while Lyons stated that the rest of the crew was busy at the time he was sent to retrieve the screen, he admitted that, as a general rule, crew members would assist each other when problems arose requiring additional manpower to complete a job. Consequently, there was simply no evidence from which a jury could have concluded that on April 29, 1978, the crew of the JOE LUCAS was inadequate to perform the task of retrieving a shaker screen.

> Similarly, there was no evidence to support the claim that the captain was negligent in sending only the plaintiff to

secure a screen. As already noted, the testimony clearly indicated that carrying a screen was a one-man job, that Lyons was not ordered to attempt to lift a shaker plate by himself, and that Lyons was never refused assistance in the task when it became apparent that he should not undertake it alone. Furthermore, there was no evidence from which a jury could infer that the captain knew or should have known that Lyons would not be able to obtain the screen by himself or that he would attempt to move a plate without help. Thus, the plaintiff failed to establish a prima facie case of negligence. *See Rice v. Atlantic Gulf & Pacific Co.,* 484 F.2d 1318, 1320 (2nd Cir.1973).

*Lyons,* 683 F.2d at 100–101.

Here, Clapsadle has testified that during the entire time that he was on the *Shirley Joy* there were only three deckhands—not four—and that only two of the three deckhands generally participated in the process of facing the tug and the barge. Clapsadle Dep. at 18–21. Clapsadle's testimony also clearly indicates that even though the third deckhand was off duty at the time of Rutherford's injury, the on-duty deckhands could have made a decision to call the off-duty deckhand on deck if they believed they needed help. *Id.* at 21. That Rutherford did not seek help suggests that he did not believe he needed it, or that even if he did, he did not notify anyone that he did. Under the circumstances, the court concludes that he has failed to establish breach of a duty by LMC which would render it liable to Rutherford in negligence.

"The maritime duty of seaworthiness requires a vessel owner 'to furnish a vessel and appurtenances reasonably fit for their intended use.'" *Babbitt v. Hanover Towing, Inc.,* 7 F.Supp.2d 650, 652 (E.D.N.C.1998) (quoting *Mitchell v. Trawler Racer,* 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960)). Moreover,

A vessel owner ... may be held liable for a breach of the duty of seaworthiness even without a finding of negligence on his part.... The warranty of seaworthiness may be breached by temporary conditions like the improper loading and stowing of cargo as well as by the presence of permanent physical defects in the vessel....

*Id.* (citations omitted). "As regards equipment, the classic case of unseaworthiness arises when the vessel is either insufficiently or defectively equipped." *Waldron v. Moore–McCormack Lines, Inc.,* 386 U.S. 724, 726, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967). However, "[u]nseaworthiness extends not only to the vessel but to the crew." *Id.* at 727, 87 S.Ct. 1410. Therefore, a shipowner may be held liable under the doctrine of unseaworthiness not only where it supplies unsafe or insufficient gear, but also where it supplies incompetent or insufficient manual assistance. *Id.* at 728, 87 S.Ct. 1410.

In *Waldron,* the plaintiff, who fell and injured his back while uncoiling a portion of heavy rope which he and another crewman had been ordered to carry 56 feet to the edge of a ship, alleged that the assignment of an insufficient number of crewmen to perform the task constituted negligence and made the vessel unseaworthy. *Id.* at 725, 87 S.Ct. 1410. The Court noted that at trial, the plaintiff had presented expert testimony indicating that three or four men, rather than the two assigned, were required to carry the line safely. *Id.* The district court allowed the negligence issue to go to the jury, which found for the shipowner, but granted a directed verdict to the shipowner on the unseaworthiness issue. An appeal panel had affirmed the decision, but the Supreme Court reversed and remanded the case, holding that the plaintiff was entitled to present his theory of unseaworthiness to the jury. *Id.* at 729, 87 S.Ct. 1410.

Here, however, LMC argues that Rutherford offers no expert testimony to support either of his theories of unseaworthiness: that the steel cable was defec-

tive, or that the manner in which the cable was being handled was unsafe.[2] Rutherford, in response, argues that expert testimony is not warranted because LMC's breach of duty is "straightforward." By "straightforward," Rutherford apparently means to suggest that a shipowner may be held liable for an unseaworthy vessel merely by asking a seaman to move or lift a heavy object, where the seaman happens to injure his back doing so, even if there is no evidence that the object could not be safely handled by one seaman alone. But a shipowner is not liable simply because it asked a seaman to perform heavy lifting. *See Martinez v. Sea–Land Service, Inc.,* 637 F.Supp. 503 (D.P.R.1986) (plaintiff who allegedly injured his back carrying two cases of soft drinks on his shoulder failed to present prima facie case of unseaworthiness). By "straightforward," Rutherford also apparently means that a shipowner may be held liable for having an unseaworthy vessel merely by choosing equipment composed of steel rather than the same, but lighter equipment composed of a synthetic substance.

■ The evidence shows that LMC could have used synthetic line—if it had chosen to.[3] However, "[t]he test of seaworthiness is whether the ship was, 'in all respects pertinent to the injury, reasonably fit to permit (the seaman) to perform his task ... with reasonable safety.' " *Lyons,* 683 F.2d at 101 (citing *Lester v. United States,* 234 F.2d 625, 628 (2nd Cir.

1956), *cert. dismissed,* 352 U.S. 983, 77 S.Ct. 384, 1 L.Ed.2d 366 (1957) and *Gutierrez v. Waterman Steamship Corp.,* 373 U.S. 206, 213, 83 S.Ct. 1185, 1190, 10 L.Ed.2d 297 (1963)). In this case, as in *Lyons,* the record is void of any evidence from which the jury could conclude that the ship was unseaworthy because LMC chose to use steel cable rather than synthetic. Under the circumstances, LMC is entitled to summary judgment in its favor on the claim of unseaworthiness.

## MAINTENANCE AND CURE

■ "Under general maritime law, when a seaman becomes ill or injured during the period of his service, the shipowner is liable to the seaman for maintenance and cure." *Watters v. Harrah's Illinois Corp.,* 993 F.Supp. 667, 669 (N.D.Ill.1998) (citation omitted). "Maintenance is the payment by a shipowner to a seaman for the seaman's food and lodging expenses incurred while he is ashore as a result of illness or accident." *Barnes v. Andover Co., L.P.,* 900 F.2d 630, 631 (3d Cir.1990). "Cure involves the payment of therapeutic, medical, and hospital expenses not otherwise furnished to the seaman[.]" *Nichols v. Barwick,* 792 F.2d 1520, 1523–24 (1986) (citation omitted). The liability for maintenance and cure, which extends during the period when the seaman is incapacitated until he reaches the maximum medical recovery, "is not predicated on the fault or negligence of the shipowner; rather, it is

**2.** Intertwined with these theories is Rutherford's suggestion that the vessel may have been unseaworthy because it had a retaining wall near the bow which prevented him from bending at the knees while performing his task. However, the presence of this retaining wall was necessary and did not render the ship unseaworthy. As Rutherford's own testimony indicates, "anybody knows that if you got a boat it's got to have a wall or water is going to come in it" and "[i]f you didn't have a wall there you'd fall off the boat or whatever. So evidently it has to be there." Rutherford Dep. at 124.

**3.** Rutherford relies heavily on an accident report which was completed on the date of his

injury, in which one of LMC's managers, Wayne Moon, indicated that LMC might resume use of synthetic lines in order to prevent a re-occurrence of similar injuries. However, LMC has never disputed that it had on occasion used synthetic lines. Instead, LMC's position is that either type of line could have been used, but that the company had ceased using the synthetic lines because they repeatedly broke—a situation presenting a different set of dangers posed by an out-of-control barge. Rutherford's own testimony indicates that the synthetic lines broke on two occasions while he was on the Genesee project. Rutherford Dep. at 32.

an incident of the marine employer-employee relationship." *Watters,* 993 F.Supp. at 669 (citations omitted).

■] In its motion, LMC argues that it has already paid Rutherford maintenance for the entire period of his convalescence, that it has paid for all cure expenses that have come due, and that it has agreed to pay for additional cure expenses that were recently presented to it. Therefore, LMC argues, because there are no outstanding maintenance or cure expenses that it is obligated to pay which it has not paid or agreed to pay, it is entitled to summary judgment on this aspect of Rutherford's claim.

In response, Rutherford argues, regarding cure, that it is untrue that LMC has paid or agreed to pay all medical expenses already incurred; he argues that some doctors' bills have not been paid at all, or have been paid by him out of his own pocket. In addition, Rutherford argues that his treating physician has recommended additional surgery, for which Rutherford assesses LMC will be liable. Rutherford apparently does not dispute that LMC's position that it has paid maintenance for the period of his convalescence.

The court finds, based on the foregoing, that a genuine issue of material fact remains regarding whether LMC is liable for additional cure expenses which have been or will be incurred by Rutherford in connection with the injury in question. Therefore, the court will grant LMC's motion for summary judgment on the issue of maintenance, but will deny LMC's motion for summary judgment on the issue of cure.

### CONCLUSION

The court grants LMC's motion for summary judgment on plaintiff's claims of negligence, unseaworthiness, and maintenance. The court denies LMC's motion, however, on the claim for cure.

### ORDER ON PLAINTIFF'S MOTION FOR RECONSIDERATION OF THE COURT'S ORDER GRANTING SUMMARY JUDGMENT

In his complaint filed in this action, plaintiff Gene A. Rutherford Jr. alleges that on August 20, 1997, while he was employed as a deckhand aboard the tug *Shirley Joy,* a vessel owned and operated by defendant Lake Michigan Contractors, Inc. ("LMC"), he sustained injuries when he slipped while attempting to face the tug to a barge. Rutherford asserted claims against LMC based on negligence under the Jones Act, 46 U.S.C.App. § 688 *et seq.,* and unseaworthiness of the vessel under general admiralty and maritime law. LMC filed a motion for summary judgment in its favor, which the court granted in part and denied in part in an Opinion and Order entered on February 14, 2000. Specifically, the court granted LMC's motion for summary judgment on plaintiff's claims of negligence, unseaworthiness, and maintenance, but denied LMC's motion on the claim for cure. Plaintiff has now filed a motion asking the court to reconsider its decision (docket no. 57).

The court denies plaintiff's motion with respect to the claims of negligence and unseaworthiness. However, with respect to the issue of maintenance, as plaintiff has noted, maintenance and cure run simultaneously. *See Holmes v. J. Ray McDermott & Co. Inc.,* 734 F.2d 1110, 1117 (5th Cir.1984) (employer bears the burden of paying maintenance and cure until medical diagnosis confirms that maximum cure has been effected), *overruled on other grounds, Guevara v. Maritime Overseas Corp.,* 59 F.3d 1496 (5th Cir.1995) Therefore, to the extent that the court has ruled that a genuine issue of fact remains regarding whether LMC is liable for cure expenses which will be incurred by plaintiff in connection with the injury in question (such as for plaintiff's additional surgery), a genuine issue of fact also remains regarding whether LMC is liable for additional maintenance. . The court's previous

decision should thus be deemed to conclude that no genuine issue remained with regard to past maintenance (i.e., that paid up to the time of the court's ruling).